# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. BENNIE OSBY

**Appeal from the Criminal Court for Shelby County**
**No. 11-02364      James C. Beasley, Jr., Judge**

---

**No. W2012-00408-CCA-R3-CD  - Filed November 2, 2012**

---

The defendant, Bennie Osby, appeals his Shelby County Criminal Court jury convictions of especially aggravated kidnapping, attempted second degree murder, aggravated robbery, and employing a firearm during the commission of a felony, arguing that the evidence was insufficient to support his convictions.  Discerning no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Barry W. Kuhn (on appeal), and Michael Johnson (at trial), Assistant District Public Defenders, for the appellant, Bennie Osby.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming and Betsy Weintraub, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case arose from events that transpired on October 21, 2010, in Memphis.  At trial, Marlon Toney testified that he and long-time friend Eric Moody were sitting in Mr. Moody's truck outside Mr. Toney's residence at 4440 Cimmaron when they observed a "suspicious guy" walking in the neighborhood.  Mr. Toney said that the man first walked to Walter Edwards' house and then walked back down past Mr. Toney's house, this time followed by another man.  The two men then walked out of Mr. Toney's line of sight, and just as Mr. Moody asked Mr. Toney if he knew the men, "they was running up

towards the car with guns drawn on [Mr. Toney and Mr. Moody]." Mr. Toney identified the defendant as the man who came to his side of the truck, pointed a gun at him, and ordered him out of the vehicle. Mr. Toney said that the defendant ordered him to lie on the ground, and he complied. The defendant then searched Mr. Toney's person as he lay on the ground. After he completed the search, the defendant ordered both Mr. Toney and Mr. Moody to stand, and then the defendant and his compatriot "marched" Mr. Toney and Mr. Moody into Mr. Toney's backyard.

Once in the backyard, the perpetrators ordered the victims onto the ground a second time and "started duct-taping [their] hands behind [their] backs." The other perpetrator asked Mr. Toney his name, and when he responded that his name was Marlon, the man said, "[Y]ou're the one I want to talk to," and then placed a piece of duct tape over Mr. Moody's mouth. The other perpetrator then asked Mr. Toney, "[W]here's the money at?," and Mr. Toney replied, "[T]he only money that I have is in my pocket." The other perpetrator then removed $150.00 from Mr. Toney's pocket. Mr. Toney explained that he had seen the other perpetrator at Walter Edwards' house earlier that evening and that he had counted out "a nice piece of money" to loan to his daughter from his unemployment benefits and placed it in his pocket while in Mr. Edwards' carport. Mr. Toney said that the other perpetrator demanded to know where the remainder of the money was and that he told the man that he had no more money. At that point, the other perpetrator accused him of lying and struck Mr. Toney in the back of the head with his handgun and kicked him in the face.

Mr. Toney testified that the other perpetrator asked him if he had more money in the house and that, when he said he did not, the other perpetrator asked who was in the house. Mr. Toney said that he told the other perpetrator that his mother, his son, and his granddaughter were in the house asleep. The other perpetrator then told the defendant that he was "fixin' to go in the house" and told Mr. Toney that he would kill anyone in the house who got up. When the other perpetrator opened the front door to the house, however, Mr. Toney's "real large pit-bull" came to the door and scared him. The other perpetrator returned to where Mr. Toney and Mr. Moody lay on the ground and told the defendant that he was not going inside the house because of the dog. The defendant then used his cellular telephone to call someone to pick them up. As they waited, the other perpetrator told Mr. Toney to take off his "jogging suit" and give it to him. The defendant took Mr. Toney's telephone and ordered Mr. Toney and Mr. Moody "to go down to the edge of the fence and jump over the gate and lay down." Mr. Toney said that they complied with the defendant's order.

Mr. Toney testified that he was able to escape from his bonds because "really it was real cheap duct tape." He and Mr. Moody jumped back over the fence "[a]lmost immediately" and started walking toward the fleeing perpetrators. When he got close to the men, he began yelling for help. At that point, both men turned around and began shooting

at Mr. Toney. Mr. Toney said that he immediately began running back toward his house. Mr. Toney testified that he saw the defendant fall to the ground, get up, and run away limping.

Mr. Toney testified that police were called to his residence and that he told police about the defendant's limping. He said that police showed him two photograph arrays and that he identified the defendant as the person who first pulled him from Mr. Moody's truck at gunpoint. He was unable to identify the other perpetrator from the second array. Mr. Toney recalled that he identified the defendant as the perpetrator during the preliminary hearing as the defendant sat with five or six other men.

Eric Moody testified that as he sat in his truck with Mr. Toney talking and listening to the radio, he "noticed some guys walking up and down the street." Sometime later, he saw the two men "walking fast" toward his vehicle, and he asked Mr. Toney if he knew the men. Before Mr. Toney, who was sending a text message on his cellular telephone, could answer, "the guy had a pistol in [Mr. Moody's] face" and ordered Mr. Moody to get out of the truck. He said that the man ordered him onto the ground and then patted him down. Another man ordered Mr. Toney to the ground and patted him down. The first man took Mr. Moody's wallet and his cellular telephone and then demanded more money. He said that the men forced him and Mr. Toney into Mr. Toney's backyard, where they bound their hands behind their backs with duct tape.

When Mr. Moody insisted that he did not have any more money, the man struck him with a pistol and placed duct tape over his mouth. Mr. Moody identified the defendant as the man who held Mr. Toney at gunpoint. Mr. Moody said that the other perpetrator threatened to enter Mr. Toney's house and that when Mr. Toney begged him not to do so, the man kicked Mr. Toney. The man attempted to enter the house but came back into the backyard when he encountered Mr. Toney's pit bulldog. The men then forced Mr. Moody and Mr. Toney to jump over the fence at the rear of Mr. Toney's backyard but not before the other perpetrator forced Mr. Toney to give him his "jogging suit." After they jumped the fence, the men told them to lie down and count to one hundred. Mr. Toney, he said, did not obey the command and jumped back over the fence almost immediately. Within a few seconds, Mr. Moody heard gunshots and Mr. Toney's saying, "[T]hat n***** shooting at me."

Mr. Moody said that he remained on the ground for several seconds after the gunfire ended and then walked to the front of Mr. Toney's house. Mr. Toney was there with his mother, his son, and his sister. Mr. Toney's mother told them that she had telephoned police.

Mr. Moody said that police showed him a photograph array, but he was unable to identify either perpetrator from any of the arrays shown to him. Mr. Moody testified that he recognized the defendant immediately when he came to testify at the defendant's preliminary hearing.

Candis Bowman testified that on October 21, 2010, she was living at the Presidential West apartment complex with her children and their father, the defendant. She said that she and the children left the apartment with Ms. Bowman's mother's boyfriend to go grocery shopping at approximately 8:00 p.m. and that the defendant stayed at the apartment. Ms. Bowman testified that she was gone for approximately three hours and that the defendant was not home when she returned from the store. She said that she put the children to bed and began to unload her groceries. Approximately 10 to 15 minutes later, Ms. Bowman heard gunshots. Within seconds, the defendant knocked on the door and told her that he had been shot. She said that the defendant told her to run a bath and that he then sat in the tub full of water. He refused her offer to call the ambulance. She observed gunshot wounds to the defendant's left shoulder and right hip as he soaked in the bathtub for nearly two hours.

At that point, Ms. Bowman became concerned and telephoned the defendant's sister "[b]ecause [she] had no information on [the defendant] besides his name and [his sister] knows more about him." The defendant's sister came to the apartment and told Ms. Bowman to telephone for help. The defendant claimed that he had been shot by unknown assailants while using the telephone outside their apartment.

During cross-examination, Ms. Bowman said that she had seen the defendant standing outside using the telephone when she returned from the store and that she had waved to him. She said that the defendant did not appear to be in any distress as he stood outside. She said that she lay down in the bed for an hour after the defendant got into the bathtub because she was nine months pregnant.

During redirect-examination, Ms. Bowman acknowledged that the statement she provided to police did not indicate that she had seen the defendant standing outside upon her return from the grocery store.

Memphis Police Department ("MPD") Officer Jonathan Chalk testified that he went to Ms. Bowman's apartment in response to her call that the defendant had been shot. He saw a gunshot wound to the back of the defendant's left shoulder and to his right hip. The defendant told Officer Chalk that he had been standing outside using the telephone when he was shot by unknown assailants. Officer Chalk examined the area where the defendant claimed to have been standing, but he found no blood, shell casings, bullets, or any other item

-4-

that indicated that a shooting had taken place at that location.

MPD Sergeant George Cave interviewed the defendant at the hospital, and the defendant told Sergeant Cave that he had been shot by unknown assailants while standing outside his apartment complex.

MPD Sergeant Veronica Wimbley, the lead investigator in the robbery of Mr. Toney and Mr. Moody, testified that she considered the defendant as a suspect in the robbery after cross-referencing Mr. Toney's statement that one of the perpetrators had been shot with the list of shootings that were reported in Memphis on that date. Accordingly to Sergeant Wimbley, only a single shooting was reported on that night, and the defendant was the victim. Based on that information, she included the defendant's photograph in an array that she displayed to both Mr. Toney and Mr. Moody. Mr. Toney identified the defendant as one of the perpetrators, but Mr. Moody did not identify any individual from the array.

Sergeant Wimbley interviewed the defendant following his release from the hospital. She also interviewed Ms. Bowman on that same day. Sergeant Wimbley testified that Ms. Bowman told her that she did not see the defendant from the time she left to go to the grocery store until he knocked on the door to tell her that he had been shot.

At the conclusion of Sergeant Wimbley's testimony, the State rested, and the defendant presented the testimony of Shelby County Sheriff's Department Deputy Eddie Gross. Officer Gross testified that semi-automatic weapons eject shell casings when fired. He admitted during cross-examination, however, that he had heard that some people attach bags or other receptacles to their weapons to catch the casings.

Based upon the foregoing proof, the jury convicted the defendant as charged of two counts of especially aggravated kidnapping, two counts of aggravated robbery, attempted second degree murder, and employing a firearm during the commission of attempted second degree murder. Following a sentencing hearing, the trial court found the defendant to be a repeat violent offender for purposes of the especially aggravated kidnapping convictions and, based upon that finding and its finding that the defendant was a dangerous offender, the trial court imposed consecutive sentences of life without the possibility of parole for those convictions. The trial court found the defendant to be a career offender for the remainder of the convictions and imposed sentences of 30 years each for the defendant's convictions of aggravated robbery and attempted second degree murder and a sentence of 15 years for the conviction of employing a firearm during the offense of attempted second degree murder. The court ordered partially consecutive service of the sentences for a total effective sentence of life without the possibility of parole plus 105 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial challenging the sufficiency of the convicting evidence followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence and argues that his convictions of especially aggravated kidnapping violate principles of due process.

The defendant challenges the sufficiency of the convicting evidence for each of his convictions. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

*Especially Aggravated Kidnapping*

The defendant contends that the evidence was insufficient to support his convictions of especially aggravated kidnapping because the State failed to establish that the removal and confinement of the victims went beyond that necessary to accomplish the aggravated robbery. The State asserts that the evidence supports the separate convictions of kidnapping.

As charged in this case, especially aggravated kidnapping is "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-305(a)(4) (2006). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

The evidence adduced at trial established that the defendant and another man forced Mr. Moody and Mr. Toney at gunpoint from Mr. Moody's truck, searched them, took

-6-

their money, and then forced them into Mr. Toney's backyard. There, Mr. Toney and Mr. Moody were bound and beaten before being ordered to scale a fence at the rear of the yard. Under these circumstances, the evidence supports the defendant's convictions of especially aggravated kidnapping.

Moreover, the defendant effectively concedes that he restrained the victims, arguing only that "[t]he restraint of the victims was only that necessary to effectuate the robbery." We turn now to this specific claim.

*A. State v. Anthony and Progeny*

In *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), our supreme court for the first time considered "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." *State v. Anthony*, 817 S.W.2d 299, 300 (Tenn. 1991). Based on principles of due process, the high court acknowledged that a period of confinement technically meeting the definition of kidnapping frequently accompanies such crimes as robbery and rape and concluded that a separate kidnapping conviction cannot be supported when "the confinement, movement, or detention [was] essentially incidental to the accompanying felony." *Anthony*, 817 S.W.2d at 305. Specifically, *Anthony* required reviewing courts to determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." *Id.* at 306.

Since its decision in *Anthony*, the supreme court has issued a series of cases addressing the ruling. First, in *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997), the court observed:

> *Anthony* and its progeny, however, are not meant to provide the rapist a free kidnapping merely because he also committed rape. The *Anthony* decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

*Id.* at 534-35. The *Dixon* court also added a second level of inquiry to the *Anthony* analysis, concluding that where the confinement is beyond that necessary for the accompanying

felony, a court must next determine "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id.* at 535. Finally, the *Dixon* court emphasized that the focus of any *Anthony* inquiry should be on "the purpose of the removal or confinement and not the distance or duration." *Id.*

The supreme court again revisited *Anthony* in the context of a kidnapping conviction in *State v. Fuller*, 172 S.W.3d 533 (Tenn. 2005), wherein the court emphasized that "'the determination of whether a detention or movement is incidental to another offense is highly dependent on the facts in each case.'" *State v. Fuller*, 172 S.W.3d 533, 538 (Tenn. 2005) (quoting *Anthony*, 817 S.W.2d at 306). The court also ruled that the *Anthony* test is not "outcome determinative," noting that the victim in *Fuller* had been able to summon help despite being bound with duct tape. Then, in *State v. Richardson*, 251 S.W.3d 438 (Tenn. 2008), the supreme court completely abandoned the "essentially incidental" analysis of *Anthony* and replaced it with the two-part test established in *Dixon*:

> The *Dixon* two-part test fully replaces the *Anthony* "essentially incidental" analysis. As we previously have observed, the *Dixon* test "provides the structure necessary for applying the principles announced in *Anthony*." Although we adhere to the due process principles adopted in *Anthony*, we now make clear that the *Anthony* analysis should not be used in conjunction with the *Dixon* two-part test. The *Dixon* test should be used exclusively in all future inquiries.

*Id.* at 443 (citation omitted). The court emphasized, "[N]o bright line exists for making the threshold determination in the first prong of the *Dixon* test. The inquiry is fact-driven." *Id.*

## B. State v. White

Most recently, in *State v. White*, 362 S.W.3d 559 (Tenn. 2012), our supreme court again addressed the precedent originally developed in *Anthony* and held "that whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012). In so holding, the court expressly overruled *Anthony*, *Dixon*, and all their progeny, specifically concluding that "[t]he separate due process test articulated first in *Anthony*, and subsequently refined in *Dixon* and its progeny, is, therefore, no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." *Id.* at 578. Instead, the court held, the jury's finding beyond a reasonable doubt all the elements of kidnapping coupled with the reviewing court's

"task . . . of assessing the sufficiency of the convicting evidence" is sufficient to protect the defendant's due process rights. *Id.* The court determined that the inclusion of false imprisonment, which requires that removal or confinement substantially interfere with the liberty of another, as a "'building block'" for all kidnapping convictions under the current version of the Code prevents the criminalizing of the type of "trivial restraints" contemplated by *Anthony* under the previous version of the kidnapping statutes. *Id.* at 576.

Although it overruled the line of cases that required a legal, as opposed to a factual due process evaluation, the court retained the requirement that the State establish that the removal or confinement of the victim went beyond that necessary to accomplish the accompanying offense, classifying it as a question of fact to be determined by a jury "properly instructed under the law." *Id.* at 577. Given this holding, the court determined that

> [w]hen jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction.

*Id.* at 578. Despite overruling *Anthony* and despite dismissing for a second time the "essentially incidental" test adopted by *Anthony*, the court determined that the requirement that the removal or confinement be more than essentially incidental to the other offense informs the "definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty." *Id.* Having thus concluded, the court ruled that, to protect the defendant's due process rights, the jury should be instructed that it must determine that the removal or confinement of the victim was "significant enough, standing alone" to support a conviction of kidnapping before imposing one when an overlapping felony accompanies the kidnapping charge. *Id.* The supreme court also developed a jury instruction to facilitate the jury's determination of whether the removal or confinement was essentially incidental to the accompanying offense. *See id.* at 580-81. The court found that the *White* jury had not been instructed on the "key" element of false imprisonment,[1] that "substantial interference with the victim's liberty" required "a finding . . . that the victim's removal or confinement was not essentially incidental to the

---

[1]The supreme court left the offense of false imprisonment out of the list of offenses for which the new instruction is required. We assume, however, that because substantial interference with liberty is a necessary element of false imprisonment, such an instruction is required for that offense when it is charged along with another felony.

accompanying felony offense." *Id.* at 580. The supreme court granted White a new trial on the basis of the "instructional error." *Id.*[2]

## C. Timing and Applicability

Having recounted the history of the due process requirement first developed in *Anthony*, we must now determine whether the ruling in *White* is applicable to this case. The jury in this case, tried in 2011, was not provided with the instruction envisioned by our supreme court. In *White*, the supreme court classified its ruling as one that clarified existing law rather than "creating a new standard for kidnapping" and stated that the ruling "does not articulate a new rule of constitutional law or require retroactive application." *Id.* at 578. The court's statement that the ruling is not entitled to retroactive application would, at first blush, suggest that it is applicable only to those cases tried after March 9, 2012, the date on which the opinion was filed. We note, however, that the court has remanded a number of cases for reconsideration in light of its ruling in *White*, *see, e.g.*, *State v. Robert Fusco*, No. M2012-01724-SC-R11-CD (Tenn. Mar. 23, 2012), suggesting that it intended retroactive application of the ruling to those already-tried cases in the appellate pipeline, that is pending direct appeal, at the time it was filed and that its use of the word "retroactive" was intended to prevent use of the ruling for collateral attack. The court opted for similar, limited retrospective application of its ruling in *State v. Burns*, 6 S.W.3d 453, 471 (Tenn. 1999), a case that also involved jury instruction error. *Wiley v. State*, 183 S.W.3d 317, 327 (Tenn. 2006). Accordingly, we will utilize the ruling in *White* to analyze the issue presented here.

Having decided that the ruling in *White* is applicable to this case, we must next determine how that ruling should be applied here. As discussed, in *White*, our supreme court dispensed with the separate due process analysis required by *Anthony* and its progeny and held that determination of guilt beyond a reasonable doubt "by a jury properly instructed under the law" followed by appellate review of the sufficiency of the convicting evidence safeguards the defendant's due process rights. *See White*, 362 S.W.3d at 577-78.

In making its ruling in *White*, however, our supreme court emphasized repeatedly that the question of whether the evidence has sufficiently established a separate kidnapping conviction is a question of fact to be determined by a "*jury properly instructed under the law*." *White*, 362 S.W.3d at 577, 579, 580 (emphasis added). Indeed, the court noted on four separate occasions that what had formerly been analyzed as a due process issue by the appellate courts was an issue *of fact* to be determined by a jury that was given the

---

[2]Interestingly, however, the instruction developed by the supreme court does not utilize the term "essentially incidental."

benefit of the instruction later crafted by the court. *See id.* Thus, the court classified the specific error in *White* as one of jury instruction error, ruling, "Because the jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony, the Defendant is entitled to a new trial on the especially aggravated kidnapping charge." *Id.* at 580.

## *1. Fairly Raising the Issue*

When the issue at hand is the omission of a jury instruction, the situation presented in both *White* and the present case, the appellate court's first task is to determine whether the evidence fairly raised the issue. In general, the trial court is obliged to instruct the jury on the rules of law that apply to the issues at trial. *Poe v. State*, 370 S.W.2d 488, 489 (1963). The duty of the trial court to charge the jury arises when an issue is fairly raised by the evidence. No duty to charge on that issue arises when the evidence fails to fairly raise it. *See State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995); *State v. McPherson*, 882 S.W.2d 365, 374 (Tenn. Crim. App. 1994); *see also* T.C.A. § 39-11-203(c) ("The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof.").

We are aware that, in *White*, the court said that its first task in applying the rules to the facts of that case was to "determine whether the evidence presented in this case is sufficient to sustain a conviction [of] . . . kidnapping." *White*, 362 S.W.3d at 579. However, we think that the court had in mind determining the *adequacy* of evidence to fairly raise the issue of whether the removal of the victim constituted a substantial interference with her liberty. First, the determination of whether the issue is fairly raised is, as noted above, time-honored and traditional. Second, the court otherwise acknowledged that the sufficiency of the evidence could not be evaluated in the absence of proper jury instructions on the affected issue. Third, in concluding its remarks on this first task of review, the court said that the character of the victim's removal or confinement "could be interpreted in different ways[,] and[] therefore, the determination of whether the removal or confinement . . . constituted a substantial interference with her liberty was a question of fact for the jury to resolve." *Id.* This statement is strongly suggestive of the "fairly raised" language contained in the case law.[3]

---

[3]The use of the term of art "sufficiency of the evidence" imports a mandate of due process such that, when the convicting evidence is legally insufficient, the charge is dismissed. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Similarly, when the proof may be interpreted to support a conviction offense, as the court seemed to indicate in *White*, the conviction must be affirmed. *Id.* The grant of a new trial could never be the disposition of a question on the sufficiency of the evidence. Moreover, we cannot fathom that the *White* court intends to dismiss a charge of kidnapping based upon a finding that the evidence did not establish

(continued...)

In the present case, we determine that the issue of whether the defendant substantially interfered with the victim's liberty in the face of companion charges of aggravated robbery and attempted second degree murder was fairly raised by the evidence.

## 2. Determination of Error

Having determined that the evidence fairly raised the issue of whether the defendant substantially interfered with the victim's liberty apart from the other felony charges, we move on to the task of determining whether the trial court erred by failing to give the jury the instruction promulgated in *White*. This task is readily accomplished. The issue was fairly raised; yet, the court did not give the mandated instruction in this case that was tried in 2011 and on appeal when *White* was filed. Therefore, based upon the case law, the failure to instruct was error.

Our next task is to determine whether the error is reversible or is harmless beyond a reasonable doubt. To determine the harmfulness of the error, we still do not address the "sufficiency of the evidence" in the *Jackson* sense but evaluate the harmful effect of the absence of the required jury instruction. For this reason, we did not analyze the issue in this case as part of our analysis of the sufficiency of the evidence above but instead consider here the harmful effect of the trial court's failure to instruct the jury that the "key element – the substantial interference with the victim's liberty – [requires] a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *White*, 362 S.W.3d at 580; *see also id.* n. 20 (indicating that the issue is subject to constitutional harmless error analysis by stating that remand for a new trial was warranted in *White* because the court could not "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error").

---

[3](...continued)
substantial interference vis-a-vis the elements of another charged – but overlapping – offense when the jury was not instructed to determine the character of such interference. Because the due process issue at stake is now deemed a factual issue to be determined by the trier of fact and not a legal issue to be determined by the trial court, *see White*, 362 S.W.3d at 577, an appellate court that embarks upon determining the "sufficiency of the evidence" on this issue despite the absence of the necessary, enabling instruction usurps the role of the trier of fact. Furthermore, even though the end result of an appeal may not depend upon the nicety of the process used, the appellate court should nevertheless strive to keep its processes of review in proper alignment. A review of the "sufficiency of the evidence" requires an assessment of the evidence in the light most favorable to the State, *see*, *e.g.*, *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); contrarily, to determine whether the evidence fairly raises a defensive issue, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including all reasonable inferences flowing from that evidence," *State v. Blackmon*, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998).

The jury in this case was not instructed that it must find "that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." Thus, the same jury instruction error that attended Jason Lee White's conviction exists here. Unlike the error in *White*, however, the error in this case can be classified as harmless beyond a reasonable doubt. Proof that the victims' removal or confinement went beyond that necessary to accomplish either of the accompanying felonies was overwhelming, and we conclude that the jury's verdict would have been the same had it been properly instructed.

*Attempted Second Degree Murder*

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1).

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).

The proof in this case showed that Mr. Toney jumped back over the fence into his yard after the perpetrators left and began yelling for help. As he chased the assailants, both the defendant and the other perpetrator fired shots at him. The defendant suffered a gunshot wound. This evidence was sufficient to support the defendant's conviction of attempted second degree murder.

*Aggravated Robbery*

"Aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a).

-13-

Both Mr. Toney and Mr. Moody testified that the defendant and the other perpetrator took money from them at gunpoint. Mr. Toney testified that his clothing was also stolen during the encounter. This evidence supports the jury's verdict.

*Employing a Firearm During Commission of a Felony*

"It is an offense to employ a firearm during the [c]ommission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). As charged in this case, attempted second degree murder is a dangerous felony. *See id.* § 39-17-1324(i)(1)(B).[4]

Again, the evidence was overwhelming that the defendant used a firearm during the commission of his attempt on Mr. Toney's life.

*Conclusion*

Because the trial court's failure to properly instruct the jury on the elements of especially aggravated kidnapping was harmless beyond a reasonable doubt and because the evidence was otherwise sufficient to support each of the defendant's convictions, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[4]Although especially aggravated kidnapping is also classified as a dangerous felony in Code section 39-17-1324, the statute precludes a separate conviction for employing a firearm during the commission of a dangerous felony where "possessing or employing a firearm is an essential element of the underlying dangerous felony as charged," as was the case here. *Id.* § 39-17-1324(c).